[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION ON MOTION TO QUASH
This case comes before the Court in connection with plaintiff's Motion to Quash a subpoena served on plaintiff's counsel. Plaintiff asserts that the subpoena, which requests production of the documents set out in Endnote 1[1], seeks documents which are protected by the attorney-client privilege. This matter has been briefed and argued extensively and is now ready to be decided. I have concluded that a partial waiver of the attorney-client privilege has occurred, for the reasons set forth.
A brief explanation of the factual background is necessary to place this ruling in context.
A February 21, 1997, Stipulation agreed to by the parties provides some of the relevant background facts in this matter, as follows:
STIPULATION
 The plaintiffs and defendant hereby stipulate that the court may assume the following facts in deciding the plaintiff's Motion to Quash dated December 18, 1996:
 1. The defendant is a corporation which purchased used paper from the plaintiff, Recycled Fibers of Connecticut, Inc. (Recycled Fibers), for resale to other end users (paper mills) and for consumption in its own paper mills. CT Page 4281
 2. Recycled Fibers of Connecticut, Inc. collected paper from its various used paper accounts, sorted the paper by grade, baled the paper by grade, baled the paper and sold it to the defendant.
 3. Recycled Fibers and the defendant had been doing business since 1987.
 4. In the late fall of 1991, Recycled Fibers raised a complaint with the defendant that it was not being paid the proper price on its sale of certain grades of paper to the defendant.
 5. Discussions and meetings were held between Recycled Fibers and the defendant about this issue.
 6. On January 8, 1992, the defendant wired $150,000.00 into the plaintiff's account.
 7. The defendant claims the wired money as a loan.
 8. Recycled Fibers claims the wired money was a settlement of the pricing dispute.
 9. Michael Botticello has been a shareholder, director and officer of Recycled Fibers of Connecticut, Inc. since 1990 and President of Recycled Fibers of Connecticut, Inc. since January 29, 1992.
 10. Angelo Squillante was President of Recycled Fibers of Connecticut, Inc. from January. 1990 until January 29, 1992.
 11. Michael Botticello had testified in the trial of this matter prior to the testimony of Dan LaBelle.
 12. Michael Botticello testified that the $150,000.00 payment wired into Recycled Fibers' checking account on January 8, 1992 was not a loan, but rather was a payment for the settlement of the CT Page 4282 paper pricing dispute between Recycled Fibers and the defendant.
 13. Angelo Squillante testified in this matter prior to the testimony of Dan LaBelle.
 14. Angelo Squillante testified that the $150,000.00 payment wired into Recycled Fibers checking account was a loan.
 15. Dan LaBelle's involvement in this matter began on or about May, 1992 with the review of draft contracts which are Defendant's Exhibit B and Plaintiff's Exhibit 3.
 16. At the time of Dan LaBelle's initial involvement in this matter, Angelo Squillante was no longer a shareholder, director or officer of Recycled Fibers of Connecticut, Inc.
 17. Angelo Squillante was a managerial employee of Recycled Fibers of Connecticut, Inc. at the time of the communication to which Dan LaBelle testified.
 18. Angelo Squillante was never a shareholder, officer or director of the plaintiff, United Paper Corporation.
Trial in this matter was proceeding before Attorney Frederick U. Conard, Jr., on November 26, 2996. John D. LaBelle, Jr., counsel to the plaintiff, Recycled Fibers of Connecticut ("Recycled Fibers"), called Dan LaBelle as a witness. A transcript of Dan LaBelle's testimony, which counsel have provided to the Court, is attached to this memorandum as Exhibit A. Familiarity with its full contents is assumed. In summary, Dan LaBelle testified as to his involvement with a matter of Recycled fibers of Connecticut, Inc., and Northshore Paper Company, also known as the Newark Group. Transcript at 1. These are the parties in the instant case.
Following various questions and answers, some objections and argument, all of which are set out fully in Exhibit A, the following colloquy occurred on direct examination of Dan LaBelle by John D. LaBelle, beginning at page 7: CT Page 4283
BY MR. LABELLE:
 Q. Mr. LaBelle, you told us that to the best of your recollection during your period of representation of Recycled Fibers that a contract between the Newark Group or Northshore and Recycled fibers of Connecticut was not signed. At the time you sent out those demand letters, had you heard anything from any officer of Recycled — strike that.
 At the time you sent out those demand letters, had you heard any statements from any officers of the Newark Group or Northshore Paper about a $150,000 loan from Northshore to Recycled Fibers of Connecticut on or about January 8th, 1992?
 A. No, I was unaware of any claim about $150,000 payment.
 Q. After you sent those demand letters, did you become aware of a claim by the Newark Group that there was or had been, in fact, a loan of $150,000 on or about January 8th, 1992?
 A. Yes. After these letters went out, I learned in part their explanation for not paying was that they claimed that there was $150,000 owed as the result of some transaction in January.
 Q. During the period that you were negotiating contracts which are Plaintiff's Exhibit 3 and Defendant's Exhibit 2, and those time frames seem to be May and June of 1992, were there any statements made to you by representatives of Northshore about $150,000 loan?
 A. No, there wasn't. I was writing letters at that time. I think there was a letter to John Gold and I see from Exhibit 2, there was a woman by the name of Joanne Gates. There was correspondence back and forth and nobody ever said anything to me about $150,000 payment or loan. CT Page 4284
 Q. When you learned about the claim that there was $150,000 loan, did you talk to representatives of Recycled Fibers about that issue?
A. I did.
Q. And who in particular did you speak to?
 A. I spoke with Mike Bottacello[2] and Angelo Squillante.
* Q. And what did Mike Bottacello tell you about the issue of the $150,000, the alleged $150,000 loan?
 A. Well, he told me in fact, that there had been a payment, back in January there had been a payment from —
 MR. BECKER: I'll object. Your Honor, this is hearsay. He is testifying about something that Mr. Bottacello told him.
 MR. LABELLE: Mr. Bottacello is an officer of Recycled Fibers and —
 MR. BECKER: It's doesn't matter who he is, it's an out of quote statement. It's not an admission against the defendant. We're the defendants. Mr. Bottacello is not the —
 MR. CONARD: Mr. Bottacello is a gentleman who has testified and he was the sole owner of the company at the time and the question is — I think this goes to the issue as counsel negotiating alleged agreement what statements were made to him by his client in connection with that agreement and the individual was in court and can be examined and cross-examined on that issue. If he is placed on the stand certainly this gentleman can be — I'm going to allow it. These hearsay objections don't impress me tremendously because I think I can weigh the response as to whether they have any validity or not.
MR. LABELLE: This is an offer of proof, your CT Page 4285 Honor. There has been testimony by Mr. Bottacello about what his position was in regard to this matter and there has been a contrary position by Mr. Squillante.
MR. CONARD: That's correct. That's correct.
 MR. LABELLE: And this is simply to indicate insofar as Attorney LaBelle knows the relative positions of the clients, the client and these two particular individuals on the matter which really is at the heart of this.
 MR. BECKER: Your Honor, I don't wish to unnecessarily prolong it. I do think that it doesn't make it any less hearsay because — understand the import of the testimony but I still thinks it's hearsay.
 MR. CONARD: I think if I'm going to resolve the claims and counterclaims in this case involve — and there is a counterclaim on behalf of the plaintiff, the defendants in this case — involve extensive oral as well as written dealings between the parties and I'm going to allow this kind of testimony to get in and weigh it once it's in.
MR. BECKER: Thank you, your Honor.
MR. CONARD: Answer the question.
BY MR. LABELLE:
Q. Do you recall the question?
A. I think you better ask again.
 MR. CONARD: Do you want to — can you read back that question that we've just been debating, please. Playback.
* (Question played back by the court monitor)
 THE WITNESS: Mr. Bottacello did tell me that there had, in fact, been a $150,000 payment back in CT Page 4286 January or whenever it was but he denied that that was a loan. He said the payment represented an adjustment on a price dispute of some sort that they had between the two companies.
BY MR. LABELLE:
Q. What did Angelo Squillante tell you?
MR. BECKER: Objection. hearsay.
MR. CONARD: I'll overrule the objection.
MR. BECKER: Thank you.
BY MR. LABELLE:
 Q. Let me finish the question. What did Angelo Squillante tell you about the payment which was made in January of 1992?
 A. He told me the same thing, at least as adamant as Mr. Bottacello that the payment was not a loan, that it represented some sort of price adjustment over a price dispute that they had between the two companies.
MR. LABELLE: Nothing further.
On cross-examination, Attorney Becker, representing defendant, questioned Dan LaBelle and then argued that plaintiff had "waived the attorney/client privilege with respect to this matter by putting on his attorney to discuss communications regarding the subject of the lawsuit and I would like to see plaintiff's file." Transcript at 14. Mr. Conard agreed that a waiver had occurred, Transcript at 16, but concluded that as a fact finder, he was not allowed to order the relief requested by defendant. The matter was then referred to the Court.
Legal Discussion
A brief review of essential principles relating to the attorney-client privilege is helpful to put the issues of this case in context. CT Page 4287
Connecticut has adopted the common-law principle of attorney-client privilege. Tunick v. Day. Berry Howard,40 Conn. Sup. 216, 218 (1984). "Where legal advice of any kind is sought from a professional legal adviser in his capacity as such, the communications relating to that purpose, made in confidence by the client, are at his instance permanently protected from disclosure by himself or by the legal adviser, except the protection be waived." Rienzo v. Santangelo, 160 Conn. 391, 395
(1971); 8 Wigmore, Evidence (McNaughton Rev. 1961), Section 2292 at page 554. The burden of proving facts essential to the privilege is on the person asserting it. State v. Hanna,150 Conn. 457, 466 (1963). The question of whether a communication is privileged is a question of law for the court to decide. Millerv. Anderson, 30 Conn. Sup. 501, 505 (1972). To be privileged, the communications must have been "made in confidence," and for the purpose of "seeking legal advice." State v. Burak,201 Conn. 517, 526 (1986), citing Doyle v. Reeves, 112 Conn. 521,523 (1931). Protecting the attorney-client privilege is of paramount importance given the crucial role it plays in our legal system.
As noted by Wigmore, "The privilege is designed to secure the client's confidence in the secrecy of his communications. . ." 8 Wigmore, Evidence, Section 2327. The privilege is the client s to waive and a waiver can be by implication Id., Section 2327. As Wigmore notes:
 A privileged person would seldom be found to waive, if his intention not to abandon could alone control the situation. There is always also the objective consideration that when his conduct touches a certain point of disclosure, fairness requires that his privilege shall cease whether he intended that result or not. He cannot be allowed, after disclosing as much as he pleases, to withhold the remainder. He may elect to withhold or to disclose, but after a certain point his election must remain final. Id., Section 2327.
Wigmore goes on to state:
 (2) The client s offer of the attorney's testimony
in the cause at large is not a waiver so far as the attorney's knowledge has been acquired casually as an ordinary witness. CT Page 4288
 But otherwise it is a waiver for, considering that the attorney ought not to used as a witness . . . the client ought to be discouraged from using his attorney in double and inconsistent capacities, and if he has seen fit to furnish him knowledge as a witness, he should deny himself the right to invoke the attorney's function as an adviser.
 (3) The client's offer of his own testimony as to specific facts about which he has happened to communicate with the attorney is not a waiver. . . . But his offer of the attorney's testimony as to such specific facts is a waiver. . . .
 (4) The client's offer of his own or the attorney's testimony as to a specific communication to the attorney is a waiver as to all other communications to the attorney on the same matter. This is so because the privilege of secret consultation is intended only as an incidental means of defense, and not as an independent means of attack, and to use it in the latter form is to abandon it in the former.
Plaintiff offers two basic arguments in support of its motion to quash.
First, it argues that the communications about which Dan LaBelle has testified were never privileged in the first instance because they were made while Dan LaBelle was acting in a capacity as a negotiator. The information Dan LaBelle received, argues plaintiff in support of its motion to quash, was received by him not as confidential communications but were provided to permit him to determine the operative facts surrounding the defendant s claims. See, e.g., Ullmann v. State, 230 Conn. 698, 713 (1994). Plaintiff argues at page 4 of its February 21, 1997, memorandum, that "The court may infer, although the transcript does not reflect it, that the response of Mr. Squillante and Mr. Botticello was communicated to the defendant." See also
Plaintiff's Exhibits 1, 2, 3 and 4. However, notwithstanding the arguments now being made, review of the record persuades me that plaintiff's claim is unpersuasive. As defendant notes, the fact that a communication may subsequently be disclosed does not necessarily mean that the communication was not intended to be CT Page 4289 confidential when made. In re Grand Jury Subpoena Duces Tecum,731 F.2d 1032, 1037 (2d Cir. 1984).
Additionally, review of the questions John LaBelle asked Dan LaBelle, in the context of the full transcript, indicates that they are broad and are not by their terms necessarily limited to time periods when Dan LaBelle was allegedly acting only as a "negotiator." In fact, the transcript makes it clear that Dan LaBelle was acting as plaintiff's lawyer during the time periods in question, Exhibit A, page 11, irrespective of what tasks he was performing. Moreover, what Dan LaBelle testified to was not only the making of a communication, but the alleged failure of Botticello and Squillante to have made a communication indicating their view of how the $150,000 transfer should properly be characterized. Necessarily, therefore, Dan LaBelle's testimony was based on information obtained by him from Squillante and Botticello at all times while performing attorney-client work for plaintiff. In sum, review of the full record, including the transcript, does not in my view support plaintiff's argument that the communications about which Dan LaBelle testified, and to which defendant objects, were not intended to be confidential when made.
Second, defendant argues that it elicited the testimony from Dan LaBelle for the purpose of impeaching the testimony of Mr. Squillante. However, plaintiff offers no case support for the proposition that the purpose of the offer is controlling on the issue of whether a waiver has occurred. Moreover, this argument amounts to a concession that Dan LaBelle was called to assist plaintiff's case on the principal issue of the case: whether the $150,000 transfer was a repayment or a loan. Clearly, plaintiff seeks a tactical benefit through the use of this testimony.
Having considered this matter and heard extensive argument, I am persuaded that an attorney-client relationship existed between Dan LaBelle and Messrs. Botticello and Squillante during the time period as to which his testimony relates, and that the testimony given by Dan LaBelle acted to waive that privilege. I agree with Mr. Conard's conclusion.
However, I also conclude that the subpoena duces tecum is unduly broad and that to deny the motion to quash in its entirety would be ill-advised because it would permit too broad a breach of the privilege to occur. CT Page 4290
Consequently, in light of the great significance rightly attached to the attorney-client privilege and the sensitivity with which such matters must be approached, I am of the view that the waiver should be viewed as limited. As Judge Leighton stated in Goldman, Sachs Co. v. Blondis, 412 F. Sup. 286, 288
(N.D.Ill. 1976), "This narrow reading of the scope of the waiver will, in the court's judgment, promote the fairness which the partial disclosure qualification is designed to encourage while serving the compelling public policy considerations underlying the attorney-client privilege." The motion to quash is therefore granted in part and denied in part, as indicated below.
The Court has already suggested, and defendant has agreed, that this matter could be resolved by simply having that portion of Dan LaBelle's testimony to which defendant objects stricken. Plaintiff has rejected this suggested resolution.
However, in light of this ruling, fairness will be best served by giving plaintiff another opportunity to consider whether it will agree that the testimony of Dan LaBelle to which defendant objects should be stricken. Plaintiff shall have until April 25, 1997, to consider whether it wishes to consent to strike the testimony of Dan LaBelle to which defendant objects, and if it agrees, to communicate this agreement in writing to defendant by April 25.
However, if plaintiff does not so agree, defendant shall be permitted to recall Dan LaBelle as a witness to question him further about any communications, written or oral, Dan LaBelle had at any time with Mr. Squillante and/or Mr. Botticello on the subject matter of the instant dispute, most particularly any communications related to the characterization of the disputed $150,000 wire transfer.
No less than two days prior to Dan LaBelle being recalled, plaintiff's counsel shall review the file and provide to defendant all correspondence, memoranda, documents, and/or notes created, maintained, or generated by Dan LaBelle, or received by him, pertaining to all of his communications with Messrs. Squillante and/or Botticello relating to, mentioning or pertaining to the characterization of the $150,000 wire transfer.
Douglas S. Lavine Judge/Superior Court CT Page 4291
 SUPERIOR COURT JUDICIAL DISTRICT OF HARTFORD/NEW BRITAIN AT HARTFORD
November 26, 1996
 Docket No.: CV950548249S
________________________________________ RECYCLED FIBERS OF CONNECTICUT, INC. ) )
VS. ) )
NEWARK GROUP, ET AL ) ________________________________________)
BEFORE: THE HONORABLE FREDERICK U. CONARD, JR. J.D. CT Page 4292
APPEARANCES:
JOHN D. LABELLE, JR., ESQUIRE 295 East Center Street Manchester, Connecticut 06040
Representing the Plaintiff
GARY M. BECKER, ESQUIRE KENT I. SCOTT-SMITH, ESQUIRE Day, Berry Howard City Place I Hartford, Connecticut 06103-3499
Representing the Defendant
 Roberta G. Carlon Court Monitor
 MR. CONARD: This is Recycled Fibers of Connecticut versus Newark Group Industry. It's now resumed. Plaintiff's counsel has some witness, I believe. Would you state your name and address, please.
 MR. LABELLE: Dan LaBelle, L-A-B-E-L-L-E, 2 Brookview Drive, Trumbull, Connecticut, 06611.
 MR. CONARD: Dan LaBelle, will you raise your right hand. Do you solemnly swear that tell the truth, the whole truth and nothing but the truth so help you God.
MR. LABELLE: I do.
MR. CONARD: You may proceed.
DIRECT EXAMINATION BY MR. JOHN LABELLE
Q Mr. LaBelle, first of all what's your relationship to me?
A I'm your brother, younger.
Q Were you previously associated with me practicing law?
A I was when we were in the firm of LaBelle, LaBelle and CT Page 4293 Moriarty and I was in that firm until March of 1995.
Q And since March of '95?
A I've been practicing law in Trumbull, Connecticut where I live with the firm of Owens, Schine and Nicola.
Q When we were in the practice of law with LaBelle, LaBelle and Moriarty, did there come a time where you became involved with a matter of Recycled Fibers of Connecticut, Inc. and Northshore Paper Company also known as the Newark Group?
A Yes.
Q What was the nature of your involvement in that? In a chronological standpoint can you tell us how you first became involved?
A My first involvement, as I recall doing any work involving Northshore and Recycled Fibers had to do with a contract that was being negotiated and it was a contract for the purchase of corrugated paper.
Q And what did you do relative to that contract?
A As I recall when the matter first came to my attention there was a draft contract which I understood to have been generated by Northshore for someone on their behalf. That was given to me and then I had some contact with people at Northshore and we exchanged letters and redrafts of the contract over several weeks or a couple of months, I don't recall the exact time period, but that process stretched out over some time.
Q I am going to show you some documents marked as first of Defendant's Exhibit B and also Plaintiff's Exhibit 3. I'd ask you to take a look at those.
A Yes, sir, I've looked at Defendant's Exhibit B and Plaintiff's Exhibit No. 3.
Q Dealing with Plaintiff's Exhibit 3, there is some handwriting on what is labeled Schedule B and I just want to tell you that the handwriting is not a part of the Exhibit.
A Okay. CT Page 4294
Q Going back to Defendant's Exhibit B, having looked at that does that document appear to be the document or one of the documents that you reviewed as a part of your representation of Recycled Fibers of Connecticut with the Newark Group?
A It does appear to be that. It certainly appears to be that. I can't from present recollection say, you know, that, for instance, paragraph 1-D, I can't say that I actually recognize that paragraph 1-D was in a document that I reviewed, but from joining from the time this appears to be and is consistent with my recollection that there were a couple of drafts of this agreement.
Q And would you look at Plaintiff's Exhibit 3.
A Again, this is consistent with my recollection and, in fact, on this document I can state with certainty that I reviewed this particular document.
Q Is that because of the writing on Exhibit B?
A That's right, that's my handwriting which appears on page 404, Schedule B.
Q Now, in looking at those documents do you find any reference in there to $150,000 loan or the advancement of $150,000 to Northshore?
 MR. BECKER: Your Honor, I'll object. I don't think there has been any foundation layed that he prepared either of those documents. As a matter of fact, he indicated couldn't recall reviewing one of them. I think it is improper to allow him to testify from the exhibit if the exhibit speaks for itself.
MR. CONARD: What's the question again?
 MR. LABELLE: I asked him in looking at those documents do you find any reference in it to $150,000 loan or the advancement of $150,000?
 MR. CONARD: I'll allow that. He's got the documents. He's testified to the extent to which he is familiar with them. The question is simply does he find any CT Page 4295 reference to a $150,000 loan in the documents he's just looked at.
MR. BECKER: We already have testimony on that.
MR. CONARD: Well, isn't that a witness?
MR. BECKER: Well, it's cumulative.
 THE WITNESS: I see no reference in Exhibit B to any kind of a $150,000 loan and I see no reference in Plaintiff's Exhibit 3 to any $150,000 loan.
BY MR. LABELLE:
Q Now, were you negotiating these contracts with people from Northshore or the Newark Group?
A I had some direct contact with them in the course of negotiating and discussing the terms of the contract. Exactly who it was at Northshore that I was dealing with, I don't presently recollect.
Q Okay. During your representation of Recycled Fibers of Connecticut with regard to these draft contracts with the Newark Group, did there ever a come a point when a contract was executed during your period of representation of Recycled Fibers?
A Not to my knowledge. As I recall there was some correspondence, there was some redrafts of contracts and to the best of my knowledge it did not kind up with an executed contract, at least not in the period of time I was involved with it.
Q Let me show you two documents.
 MR. BECKER: Your Honor, I am just not certain whether this is really rebuttal but —
 MR. CONARD: Neither do I but — oh, well, wait a minute now. I think we reserve both sides. I am not going to halt testimony.
MR. BECKER: I understand. CT Page 4296
BY MR. LABELLE:
Q I am showing you two documents and ask you to take a look at those.
A Yes, sir.
Q Do you recognize those?
A I do.
Q First of all, do you recognize the signature on the documents?
A I do.
Q Whose signature is it?
A It's my own.
Q And can you identify those documents?
A These are two letters that I wrote in November 1992 on behalf of Recycled Fibers of Connecticut, Inc. and also on behalf of another corporate client, United Paper Corporation and generally, I would describe them as demand letters. They had to do with some accounts that were overdue.
Q And next to those documents there are some green cards?
A That's correct. Those are certified mail return receipts. I sent a letter certified.
MR. LABELLE: I'd like to offer these.
 MR. BECKER: Your Honor, I don't really see that they are relevant to the purpose that we have this witness here today. If Attorney LaBelle wanted to put on evidence of demand as part of his case in chief then that was the time to do it.
 MR. LABELLE: Your Honor, this is leading up — I'll state it here — it's leading us to some rebuttal testimony. I'm simply setting the stage for the rebuttal. CT Page 4297
 MR. CONARD: I'll allow them. They may be admitted. As two items or one?
 MR. LABELLE: There are two different locations, they ought to be two separate.
MR. CONARD: Plaintiff's Exhibits No. 9 and 10.
(Plaintiff's Exhibit No. 9, Letter, marked into evidence)
(Plaintiff's Exhibit No. 10, Letter, marked into evidence)
 MR. BECKER: Are we doing them by date? Are they both the same date?
 MR. LABELLE: One went to New Jersey, I believe. One went to Massachusetts, Salem, Mass. Why don't we make the letter to John Gold, Plaintiff's 9.
 MR. CONARD: Plaintiff's 9 is a letter dated November 19th, 1992 addressed to Mr. John Gold and Plaintiff's 10 is a letter dated November 19th, '92, to Mr. William Tuttle, T-U-T-T-L-E.
BY MR. LABELLE:
Q Mr. LaBelle, you told us that to the best of your recollection during your period of representation of Recycled Fibers that a contract between the Newark Group or Northshore and Recycled Fibers of Connecticut was not signed. At the time you sent out those demand letters, had you heard anything from any officer of Recycled — strike that.
At the time that you sent out those demand letters, had you heard any statements from any officers of the Newark Group or Northshore Paper about a $150,000 loan from Northshore to Recycled Fibers of Connecticut on or about January 8th, 1992?
A No, I was unaware of any claim about $150,000 payment.
Q After you sent those demand letters, did you become aware of a claim by the Newark Group that there was or had been, in fact, a loan of $150,000 on or about January 8th, 1992?
A Yes. After these letters went out, I learned in part their CT Page 4298 explanation for not paying has that they claimed that there was $150,000 owed as the result of some transaction in January.
Q During the period that you were negotiating contracts which are Plaintiff's Exhibit 3 and Defendant's Exhibit 2, and those time frames seem to be May and June of 1992, were there any statements made to you by representatives of Northshore about $150,000 loan?
A No, there wasn't. I was writing letters at that time. I think there was a letter to John Gold and I see from Exhibit 2, there was a woman by the name of Joanne Gates. There was correspondence back and forth and nobody ever said anything to me about $150,000 payment or loan.
Q When you learned about the claim that there was $150,000 loan, did you talk to representatives of Recycled Fibers about that issue?
A I did.
Q And who in particular did you speak to?
A I spoke with Mike Bottacello and Angelo Squillante.
* Q And what did Mike Bottacello tell you about the issue of the $150,000, the alleged $150,000 loan?
A Well, he told me, in fact, that there had been a payment, back in January there had been a payment from —
 MR. BECKER: I'll object. Your Honor, this is hearsay. He is testifying about something that Mr. Bottacello told him.
 MR. LABELLE: Mr. Bottacello is an officer of Recycled Fibers and —
 MR. BECKER: It's doesn't matter who he is, it's an out of quote statement. It's not an admission against the defendant. We're the defendants. Mr. Bottacello is not the —
 MR. CONARD: Mr. Bottacello is a gentleman who has testified and he was the sole owner of the company at the time and the question is — I think this goes to the issue CT Page 4299 as counsel negotiating alleged agreement what statements were made to him by his client in connection with that agreement and the individual was in court and can be examined and cross-examined on that issue. If he is placed on the stand certainly this gentleman can be — I'm going to allow it. These hearsay objections don't impress me tremendously because I think I can weigh the response as to whether they have any validity or not.
 MR. LABELLE: This is an offer of proof, your Honor. There has been testimony by Mr. Bottacello about what his position was in regard to this matter and there has been a contrary position by Mr. Squillante.
MR. CONARD: That's correct. That's correct.
 MR. LABELLE: And this is simply to indicate insofar as Attorney LaBelle knows the relative positions of the clients, the client and these two particular individuals on the matter which really is at the heart of this.
 MR. BECKER: Your Honor, I don't wish to unnecessarily prolong it. I do think that it doesn't make it any less hearsay because — I understand the import of the testimony but I still thinks it's hearsay.
 MR. CONARD: I think if I'm going to resolve the claims and counterclaims in this case involve — and there is a counterclaim on behalf of the plaintiff, the defendants in this case — involve extensive oral as well as written dealings between the parties and I'm going to allow this kind of testimony to get in and weigh it once it's in.
MR. BECKER: Thank you, your Honor.
MR. CONARD: Answer the question.
BY MR. LABELLE:
Q Do you recall the question?
A I think you better ask again.
 MR. CONARD: Do you want to — can you read back that question that we've just been debating, please. CT Page 4300 Playback
* (Question played back by the court monitor)
 THE WITNESS: Mr. Bottacello did tell me that there had, in fact, been a $150,000 payment back in January or whenever it was but he denied that that was a loan. He said the payment represented an adjustment on a price dispute of some sort that they had between the two companies.
BY MR. LABELLE:
Q What did Angelo Squillante tell you?
MR. BECKER: Objection. Hearsay.
MR. CONARD: I'll overrule the objection.
MR. BECKER: Thank you.
BY MR. LABELLE:
Q Let me finish the question. What did Angelo Squillante tell you about the payment which was made in January of 1992?
A He told me the same thing, at least as adamant as Mr. Bottacello that the payment was not a loan, that it represented some sort of price adjustment over a price dispute that they had between the two companies.
MR. LABELLE: Nothing further.
CROSS-EXAMINATION BY MR. BECKER
Q Now, Mr. LaBelle, you were Recycled Fibers of Connecticut's lawyer at this time. Correct?
A I was one of them.
Q You were one of the lawyers. And, in fact, the law firm of which you are a member is still representing Recycled Fibers of Connecticut in this litigation; isn't that correct?
A The successor of the law firm. CT Page 4301
Q The successor of the law firm?
A Yes.
Q Now, you indicated with respect to Exhibits 9 and 10 that you prepared those exhibits. Correct?
A I wrote the letters, correct.
Q You wrote the letters and they're demand letters. Correct?
A Correct.
Q And they specifically indicate in there that you'll bring suit if they don't pay monies that are allegedly owing; is that correct? I believe that's the last paragraph.
A Correct.
Q And, in fact, those letters subsequently led to this lawsuit; isn't that correct?
A I don't know if the letters led to it, the controversy led to it, same controversy.
Q Same controversy, correct. Now, you indicated that after you sent the letters, they didn't pay in response to these letters; is that correct?
A To my knowledge they did not pay, to my knowledge they never paid.
Q And then you brought the lawsuit. Correct?
A I did not personally.
Q Someone from your office did?
A My best recollection — I'm sure the court file reflects it — I believe the suit was actually commenced by Tom Moriarty.
Q He was a member and associate of your law firm?
A That's right. CT Page 4302
Q And after the lawsuit was commenced you spoke with Mr. Bottacello about this, didn't you?
A If I — had I spoken to him about it after the lawsuit has been commenced?
Q Well, I withdraw it. You indicated that you —
A I spoke to him after the controversy arose. I'm not sure, I'd have to see what date the lawsuit was commenced to tell you whether or not I actually spoke to him subsequent to the actual commencement of the lawsuit. That I'm not sure.
Q And you indicated that he was the one who told you about this $150,000 payment. Correct?
A He and I discussed it, I'm not sure whether he was the person from whom I first learned about it, that I'm not sure of. It's possible that I learned about it from somebody at Northshore, that I learned about the claim at Northshore.
Q You specifically spoke to Mr. Bottacello?
A Yes, whether I learned it from him or Mr. Squillante or somebody at Northshore. When I learned about it I discussed it further both with Mr Bottacello and Mr. Squillante.
Q And Mr. Squillante was an employee of Recycled Fibers at that time?
A To the best of my knowledge, yes.
Q So Recycled Fibers is your client. Correct?
A Correct.
Q And communication by your client to you about the subject of this litigation. Correct?
A Communication by a employee of Recycled Fibers of Connecticut.
Q By an officer and director as a matter of fact; isn't that correct? CT Page 4303
MR. LABELLE: Who are you talking about?
 MR. BECKER: Mr. Squillante. I'm sorry. Mr. Bottacello.
THE WITNESS: Correct, yes.
BY MR. BECKER:
Q Did you have other communications regarding this matter with Mr. Bottacello?
A I'm sure I have.
Q Would those be reflected in the file of this case kept by your office?
A They may or they may not, I don't know.
Q Do you expect if you were able to review the file you'd be able to locate such correspondence or communications?
A I'm sure I could.
 MR. BECKER: Basically, your Honor, I believe that plaintiff has waived the attorney/client privilege with respect to this matter by putting on his attorney to discuss communications regarding the subject of the lawsuit and I would like to see plaintiff's file. I'm willing to take a recess to do it.
 MR. CONARD: In what respect do you say he has waived privilege?
 MR. BECKER: Attorney LaBelle was attorney for Recycled Fibers of Connecticut.
MR. CONARD: Yes.
 MR. BECKER: And he had communications that he's just testified to, be it over our objection, he testified to communications he's had with Mr. Bottacello, an officer and director of the client, with respect to the subject matter of this litigation specifically with respect to this CT Page 4304 $150,000 payment. And I believe that testifying to that waives the attorney/client privilege with respect to those communications.
MR. CONARD: What's your comment?
 MR. LABELLE: My comment is that these issues are — what I brought up here was to give you a chronology of what happened, what his involvement was and it all led up to the last question which is what did Mr. Squillante say. The purpose of that whole scenario was to get in the fact that Mr. Squillante's position, at least as far as Mr. LaBelle was concerned, differs from what Mr. Squillante testified to. The whole purpose of the examination was to impeach Mr. Squillante and I would have thought that would have been obvious when we got to the end of it.
MR. BECKER: I understand the purpose.
 MR. CONARD: Are you objecting to — why don't you examine counsel.
 MR. BECKER: I want Attorney LaBelle, the witness, to look through the case file of plaintiff and give me communications between he and Mr. Bottacello regarding this $150,000.
 MR. CONARD: There's been discovery in this matter, I assume. I don't know what's been asked for and what has been furnished. It seems to me we may be wasting an enormous amount court of time.
 MR. LABELLE: Can I back up just a moment and say something, your Honor?
MR. CONARD: Yes.
 MR. LABELLE: The evidence in this case is clear that Mr. Squillante's involvement as an officer and director of Recycled Fibers of Connecticut ceased on January 29th, 1992 after that he was an employee.
MR. CONARD: Correct.
MR. LABELLE: Well, that is here. Mr. Squillante CT Page 4305 testified to it. After January 29th, 1992 Mr. Squillante is not an officer or director of Recycled Fibers. I specifically gave Mr. LaBelle the exhibits, Plaintiff's —
MR. CONARD: I don't remember the dates on them.
 MR. LABELLE: The reason I did this is to get his involvement as commenced, Defendant's Exhibit B is May 26th, 1992 and Plaintiff's Exhibit 3 is June 17th of '92 which are dates after the point when Mr. Squillante was no longer an officer or director of Recycled Fibers. When the issue arose about the $150,000, it was presented to Mr. LaBelle. He spoke not only to Mr. Bottacello about it but also to Mr. Squillante who is involved and the purpose of the testimony was to indicate what Mr. Squillante told him which is inconsistent with what Mr. Squillante testified to and which is consistent with what was shown in Plaintiff's Exhibit 8 which Mr. Squillante also denied asserting or denied was his position.
 MR. CONARD: I'm going to hold subject to further proof or evidence that what has been asserted in the testimony of the witness at this time waives the privilege of attorney privilege between Recycled and him and I'm assuming in connection with that ruling that whatever discovery has called for has been delivered.
 MR. BECKER: Your Honor, I believe we asked for any and all documents concerning the $150,000 barring transfer. It's reasonable to assume that Attorney LaBelle would not turn over documents he considered attorney/client privilege at that time.
 MR. CONARD: I don't know whether any issue was ever raised at that time either. At this stage I'm going to —
 MR. LABELLE: One other thing. The only testimony there was about any officer of Recycled Fibers, Mr. Bottacello's statements which he'd already made in court what Mr. LaBelle relates are consistent with exactly what Mr. Bottacello has already testified to in court for which counsel has had the opportunity to conduct a cross examination
MR. CONARD: And Mr. Bottacello, incidentally, may CT Page 4306 be recalled by either party on this on the Court's ruling on how we will proceed. So that if you didn't want to produce him, that defendants may call him.
 MR. LABELLE: I specifically reserve the right to call him again.
 MR. CONARD: I know, I say if you didn't wish to call him, they can still call him under my ruling for the proceeding to keep things moving.
 MR. BECKER: Your Honor, I think to keep things moving we might as well move on to other witnesses but, your Honor, I believe that I'm entitled to these communications. His privilege has been waived and —
 MR. CONARD: Well, if you need to have a ruling on that other than what I'm making which I'm not really under the statute, I suppose you has to go to a judge of superior court to get that ruling then we can suspend proceedings and resume when that's been done. I'm not in a position to rule. I'm a fact finder under the statute and I am allowed to make, draw conclusions of law in respect to my decision, but I am not allowed to order the kind of order you are asking me to do at this time under the statute. So if you insist on pressing that we can suspend the proceedings and we can resume on a mutually agreeable date for resumption of trial after the Court rules on whether the plaintiff should be ordered to perform this function.
 MR. BECKER: What I think may make the must sense is to continue on with the witnesses. They are here, I don't want to make them travel again and I'll reserve my right to bring it up with the Court.
MR. CONARD: Certainly.
 MR. BECKER: I have no further questions, your Honor.
MR. CONARD: Any questions?
MR. LABELLE: Nothing further, your Honor.
THE WITNESS: Good day, your Honor. CT Page 4307
MR. CONARD: Thank you.
 MR. BECKER: Your Honor, could we have a brief recess.
MR. CONARD: Sure.
(Recess was taken)
CERTIFICATION
I hereby certify that the foregoing page 1 through 18 is a true and accurate exerpt from the transcript in the aforementioned matter heard before the Honorable Frederick U. Conard, Jr. J.D. at the Hartford Superior Court, Hartford, Connecticut, on the 26ht day of November, 1996.
Dated this 9th day of January, 1997 at Hartford, Connecticut.
 _____________________ Roberta G. Carlon Court Monitor